In the
United States Court of Appeals
For the Seventh Circuit

No. 96-3511

JANE DOE, a minor, JOHN DOE, individually and as
father and next friend of Jane Doe, and JANET DOE,
individually and as mother and next friend of
Jane Doe,

Plaintiffs-Appellees,

UNITED STATES OF AMERICA,

Intervening Appellee,

v.

UNIVERSITY OF ILLINOIS, a public corporation,

Defendant-Appellant.

No. 96-4148

JANE DOE, a minor, JOHN DOE, individually and as
father and next friend of Jane Doe, and JANET DOE,
individually and as mother and next friend of
Jane Doe,

Plaintiffs-Appellants,

v.

UNIVERSITY OF ILLINOIS, a public corporation,

Defendant-Appellee.

Appeals from the United States District Court
for the Central District of Illinois.
No. 96-1129--Michael M. Mihm, Chief Judge.

ARGUED SEPTEMBER 3, 1997--DECIDED MARCH 3, 1998


        Before CUMMINGS, COFFEY and EVANS, Circuit Judges.*

        CUMMINGS, Circuit Judge.  Appellee/cross-appellant
Jane Doe was a student at University High School in
Urbana, Illinois./1 Although University High is a
public school, it is affiliated with the defendant
University of Illinois, which has responsibility
for overseeing the school's administration. During
a period from January 1993 through early May 1994,
while a student at University High, Jane Doe was
the victim of an ongoing campaign of verbal and
physical sexual harassment perpetrated by a group
of male students at the school. Doe and her parents
complained on numerous occasions to officials of

both the high school (including two successive school Principals, a counselor, the Assistant Director, and the person appointed as intake officer for sexual harassment complaints) and the University of Illinois (including two Vice Chancellors, two University police officials, the Ombudsperson, and the liaison person between the University and the high school), but those officials allegedly did not do nearly enough to combat the harassment.

Because the sufficiency of Doe's allegations of sexual harassment is not at issue on this appeal, it is not necessary to describe in detail the campaign of harassment and intimidation to which she was subjected by the self-styled "posse" of male students. It is enough to note here that according to the Magistrate Judge's Report and Recommendations, the male students' conduct included unwanted touching, epithets, and the deliberate exposure of one student's genitals in front of Doe. Although school officials did suspend two of the male students for ten days and transfer one student out of Doe's biology class, Doe claims that the school and the University took little or no meaningful action to punish the sexual harassment or to prevent further occurrences. Indeed, the complaint alleges that some administrators suggested to Doe that she herself was to blame for the harassment, and that it was she who ought to adjust her behavior in order to make it stop. On one occasion, University High's Assistant Director told Doe and two of her friends to start acting like "normal females" and scolded them for making allegations of harassment that might injure some of the male students' futures. Ultimately, Jane Doe's parents removed her from the school as a result of the campaign of harassment and sent her to a private high school in another state.

On May 24, 1995, Doe and her parents filed this suit against the University of Illinois and various individual officials of University High and the University of Illinois. They alleged violations of 20 U.S.C. secs. 1681 et seq. (Title IX) and of 42 U.S.C. sec. 1983, and sought damages under the Illinois Family Expense Statute, 750 ILCS 65/15. After the plaintiffs voluntarily dismissed certain claims, Magistrate Judge David G. Bernthal entertained the defendants' motion to dismiss all of the remaining claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In a lengthy Report and Recommendations, he recommended that all of the remaining claims be dismissed. He further recommended that Jane Doe be granted leave to refile her claim against the University of Illinois for intentional sexual discrimination in violation of Title IX, but that all other claims be dismissed with prejudice.

In an order dated March 29, 1996, Chief Judge Mihm adopted the Magistrate Judge's Report and Recommendations and dismissed all claims, allowing Doe leave to refile her individual Title IX claim against the University.

On April 12, 1996, the University requested that the district court reconsider its decision to allow Doe to replead the Title IX claim, in light of the United States Supreme Court's decision in Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114, which had been made public on March 27, 1996. The University's motion for reconsideration asserted for the first time/2 that the Title IX claim against the University was barred by the Eleventh Amendment to the United States Constitution, because Title IX did not validly abrogate the States' (and thus the University's) sovereign immunity from suit. The district court denied the University's motion for reconsideration on September 25, 1996, holding that both Title IX and the statute that expressly subjected States to suit for violations of Title IX were enacted at least in part pursuant to Congress' powers under Section 5 of the Fourteenth Amendment, and therefore that Congress validly abrogated the States' sovereign immunity with respect to Title IX suits.

The University appeals the district court's rejection of its Eleventh Amendment defense. Plaintiff Jane Doe also appeals the court's dismissal of her Title IX claim against the University pursuant to Federal Rule of Civil Procedure 12(b)(6). On Doe's motion, the two appeals were consolidated. For the reasons set forth below, this Court affirms the district court's holding with respect to the University's Eleventh Amendment defense and reverses the court's holding with respect to Jane Doe's Title IX claim.

I. THE ELEVENTH AMENDMENT IMMUNITY ISSUE

The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The University argues that it is immune from federal court suits under Title IX because it has not consented to such suits, and Congress has not validly abrogated its Eleventh Amendment immunity in the context of Title IX. The district court disagreed, holding in its denial of the University's motion for reconsideration that Congress, in enacting Title IX and rendering it enforceable against the States (via the Equal Rights Remedies Equalization Act ("Equalization Act"), 42 U.S.C. sec. 2000d-7), had

unequivocally and validly abrogated the States'
sovereign immunity with regard to suits under Title
IX./3

A. The Eleventh Amendment's Application to Federal
Question Suits

Jane Doe argues in response to the University's
immunity claim that the Eleventh Amendment does not
give States immunity from federal question suits.
Doe observes that the explicit text of the
Amendment mentions only suits brought against a
State by citizens of another State or of a foreign
country. Based on this literal reading of the
Amendment and a number of dissenting and concurring
Supreme Court opinions, Doe urges this Court to
hold that Eleventh Amendment immunity is not
present in this case, which involves a federal
question suit by a citizen of Illinois against the
University of Illinois. Even were this Court
inclined so to hold, however, it would not be free
to do so. In Seminole Tribe of Florida v. Florida,
116 S. Ct. 1114, 1122, the Supreme Court reiterated
its view that the Eleventh Amendment extends beyond
its literal language to give the States sovereign
immunity against all suits by individuals for
damages. See id. at 1122 (citing Hans v. Louisiana,
134 U.S. 1); but see Seminole Tribe, 116 S. Ct. at
1137 (Stevens, J., dissenting) (arguing that Hans
did not hold suits by citizens of the State to be
sued barred by the Eleventh Amendment); id. at 1146
(Souter, J., dissenting) (stating that Hans was
incorrectly decided and that the Eleventh Amendment
bars only diversity suits against States). Doe's
contention that the Eleventh Amendment does not
apply in this case is therefore without merit.

B.   Abrogation of Eleventh Amendment Immunity

Congress may abrogate States' Eleventh Amendment
immunity if it both unequivocally expresses its
intent to do so and acts pursuant to a valid
exercise of power. Seminole Tribe, 116 S. Ct. at
1123. The University concedes, as it must, that
Title IX and the Equalization Act, read together,
unequivocally state Congress' intent to abrogate
the States' Eleventh Amendment immunity, so the
dispute centers around whether Congress acted
pursuant to a valid exercise of power.

In Seminole Tribe, the Supreme Court held that
the Indian Commerce Clause of the Constitution
(art. I, sec. 8, cl. 3) does not give Congress the
power to abrogate the States' Eleventh Amendment
immunity. Id. at 1131. More broadly, the Court
expressly overruled its prior decision that the
Interstate Commerce Clause (art. I, sec. 8, cl. 3)
did give Congress the power to abrogate. Id. at
1128 (overruling Pennsylvania v. Union Gas Co., 491
U.S. 1). The Court stated that the powers granted

to Congress in Article I of the Constitution could not be used to expand federal court jurisdiction under Article III at the expense of the States' Eleventh Amendment immunity. Id. at 1132. The Court reaffirmed, however, the principle that Congress may abrogate the States' Eleventh Amendment immunity when it acts pursuant to Section 5 of the Fourteenth Amendment./4 Id. at 1125, 1128 (citing Fitzpatrick v. Bitzer, 427 U.S. 445). Because the Fourteenth Amendment was "adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution," it "operated to alter the preexisting balance between state and federal power achieved by Article III and the Eleventh Amendment." Id. at 1128. When acting pursuant to its powers under Section 5 of the Fourteenth Amendment, therefore, Congress can abrogate the States' immunity from suit.

Neither the Supreme Court nor this Court has resolved the question of whether Title IX was enacted pursuant to Congress' Section 5 powers. See Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 75 n.8 (declining to decide "which power Congress utilized in enacting Title IX"); Smith v. Metropolitan Sch. Dist. Perry Township, 128 F.3d 1014, 1028 (7th Cir. 1997) (holding that "Title IX was passed pursuant to Congress' Spending Clause power" but not addressing possible alternative basis in Section 5). The district court in the present case held that Title IX, while it is undoubtedly an exercise of Congress' Article I Spending Clause power, was also enacted pursuant to Section 5 of the Fourteenth Amendment. The court further held that the Equalization Act, which expressly made the States subject to suits to enforce Title IX, "was clearly enacted pursuant to the Fourteenth Amendment." Relying upon this Court's decision in EEOC v. Elrod, 674 F.2d 601, 608 (7th Cir. 1982), the district court stated the standard for determining whether a statute was enacted pursuant to the Fourteenth Amendment as "whether the objectives of the legislation are within Congress' power under the amendment." The court then concluded that "since the objective of Title IX is to prevent discrimination based on sex in federally funded programs and preventing discrimination is central to Congress' power under the Fourteenth Amendment, . . . Title IX was also enacted pursuant to sec. 5 of the Fourteenth Amendment."

The University of Illinois asserts here that Seminole Tribe and other Supreme Court decisions compel this Court to overrule Elrod and hold that the proper inquiry is not whether the statute at issue is within Congress' power under the Fourteenth Amendment, but rather whether Congress in fact enacted the statute pursuant to that power. Because neither Title IX nor its legislative

history unambiguously states that Congress intended to act pursuant to Section 5 of the Fourteenth Amendment,/5 the University reads the Supreme Court's holdings in Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, and Gregory v. Ashcroft, 501 U.S. 452, as forbidding courts from inferring such an intent.

The University quotes at length from Gregory interpreting Pennhurst to hold that courts "should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." Gregory, 501 U.S. at 469. The University argues that this principle from Pennhurst means that this Court should only find that Congress has enacted legislation pursuant to Section 5 when Congress has stated unambiguously that it intended to do so. This Court held in Elrod, however, that Pennhurst was inapposite to the inquiry into a statute's constitutional grounding in Section 5, primarily because it was a case involving statutory construction, rather than "congressional authority to legislate." Elrod, 674 F.2d at 608 n.8./6 In other words, the question in Pennhurst was whether Congress intended a particular result, regardless of the constitutional grant of power under which it acted. In the present inquiry, by contrast, the intended result (of subjecting States to suit for violations of Title IX's substantive provisions) is clear, and the grant of power under which Congress acted is at issue.

Thus the University's reliance upon the Gregory Court's reading of Pennhurst to the effect that, "[b]ecause Congress nowhere stated its intent to impose mandatory obligations on the States under its sec. 5 powers, [the Court] concluded that Congress did not do so," is misplaced. What the Pennhurst Court held that Congress did not do was "impose mandatory obligations," not "[act] under its sec. 5 powers." The Supreme Court reached a similar conclusion in EEOC v. Wyoming, 460 U.S. 226, 243 n.18, where it held that Pennhurst was irrelevant "to the question of whether . . . Congress acted pursuant to its powers under sec. 5," because, in terms of the substantive obligations imposed by the statute, "there [was] no doubt what the intent of Congress was."

The University identifies in the Supreme Court's decisions an "increasingly strict view of congressional waivers of sovereign immunity." In support of this proposition, it cites Pennhurst, Gregory, and Seminole Tribe. The University's reliance upon the former two cases is curious, given that neither decided an issue of sovereign immunity. It is, on the other hand, clear that Seminole Tribe contracted Congress' power to abrogate the States' Eleventh Amendment immunity.

Neither that case nor any other, however, compels this Court to abandon the analysis employed in Elrod. Indeed, other courts of appeals, in decisions reached after Seminole Tribe, have adhered to an analysis very similar to that in Elrod for determining whether Congress acted pursuant to its Section 5 powers.

In Crawford v. Davis, 109 F.3d 1281 (8th Cir. 1997), the Eighth Circuit explicitly held, as this Court does today, that Title IX was enacted pursuant to Section 5. Id. at 1283. In so deciding, the court articulated its inquiry as "whether Congress could have enacted the legislation at issue pursuant to a constitutional provision granting it the power to abrogate." Id. The court went on to state, "As long as Congress had such authority as an objective matter, whether it also had the specific intent to legislate pursuant to that authority is irrelevant." Id.

Similarly, the Sixth Circuit recently reaffirmed an earlier decision that the Equal Pay Act was enacted pursuant to Section 5. Timmer v. Michigan Dep't of Commerce, 104 F.3d 833, 838-839 (6th Cir. 1997) (citing Marshall v. Owensboro-Daviess County Hosp., 581 F.2d 116, 119 (6th Cir. 1978)). The court recognized that Congress made no explicit statement of the constitutional basis for its legislation, but held that "[i]t was not necessary for Congress to expressly rely on sec. 5 in exercising its power because such power clearly existed." Id. at 839 (citation omitted). The Sixth Circuit in Timmer confronted the same arguments the University raises in this case--that some combination of the Supreme Court holdings in Pennhurst and Seminole Tribe required a "clear statement" from Congress before a court could find that Congress acted pursuant to Section 5. The Sixth Circuit rejected those arguments, and this Court agrees with both its reasoning and its conclusion. See also Clark v. California, 123 F.3d 1267, 1270 (9th Cir. 1997) (stating that for Eleventh Amendment abrogation purposes, "a statute is 'appropriate legislation' to enforce the Equal Protection Clause if the statute 'may be regarded as an enactment to enforce the Equal Protection Clause, [if] it is plainly adapted to that end and [if] it is not prohibited by but is consistent with the letter and spirit of the constitution'") (quoting Katzenbach v. Morgan, 384 U.S. 641, 651).

Aside from the decisions of other circuits utilizing an approach very similar to that in Elrod, there is nothing odd in the proposition that Congress may have acted pursuant to more than one of its sources of power in enacting a single piece of legislation. In Elrod itself, this Court observed that the statute at issue there, the Age Discrimination in Employment Act, "follows the

familiar pattern of contemporary civil rights acts in grounding prohibitions against private parties in the Commerce Clause, while reaching government conduct by the more direct route of the Fourteenth Amendment." Elrod, 674 F.2d at 604; see also Fullilove v. Klutznick, 448 U.S. 448, 473 (finding that Congress used an "amalgam" of its powers in enacting minority business enterprise provision of Public Works Employment Act of 1977), overruled on other grounds by Adarand Constructors, Inc. v. Pena, 515 U.S. 200. It is equally sensible that Congress, in using federal educational funds as the core of Title IX, should use its Spending Clause powers to reach private actors and its Fourteenth Amendment powers to reach the States.

This conclusion answers the argument of the Fifth Circuit that Title IX's use of federal funds as a lever to insure compliance with its anti-discrimination objectives indicates that Congress could not have been acting under its Fourteenth Amendment powers. See Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006, 1012 n.14 (5th Cir. 1996) (noting that imposing Title IX liability on a school that receives federal but not State funds would "push the limits of the Fourteenth Amendment"), certiorari denied, 117 S. Ct. 165. A chronological perspective reinforces this view. It is not at all unlikely that Congress, perceiving the possible limits upon its Fourteenth Amendment power over non-State actors, initially chose to use its Spending Clause power to bind such actors to the requirements of Title IX. When Congress subsequently chose, via the Equalization Act, to make those same strictures more readily enforceable against State-run schools, it used the already existing federal funds framework of Title IX. Congress' consistent use of federal funds as the "trigger" for Title IX coverage, however, does not mean that it did not also intend to act pursuant to its acknowledged powers over State actors granted by Section 5 of the Fourteenth Amendment. The Fifth Circuit's approach would turn a purely efficient decision to utilize an existing statutory scheme into a declaration that the Fourteenth Amendment was not involved in an enactment that, at least as it applies against the States, is squarely within the purview of that Amendment.

This Court, therefore, reaffirms the analysis we used in Elrod and applies it here. The appropriate question is, were "the objectives of [Title IX] . . . within Congress' power under the [Fourteenth] amendment?" See Elrod, 674 F.2d at 608. The answer is, quite plainly, that they were. As the court below noted (quoting Cannon v. University of Chicago, 441 U.S. 677, 678), protecting Americans against "invidious discrimination of any sort, including that on the basis of sex," is a central function of the federal government. Prohibiting

"arbitrary, discriminatory government conduct . . . is the very essence of the guarantee of 'equal protection of the laws' of the Fourteenth Amendment." Elrod, 674 F.2d at 604. Title IX prohibits such discriminatory government conduct on the basis of sex when it occurs in the context of State-run, federally funded educational programs and institutions. This Court holds, therefore, that Congress enacted Title IX and extended it to the States, at least in part, as a valid exercise of its powers under Section 5 of the Fourteenth Amendment. For that reason, Congress validly abrogated the States' Eleventh Amendment immunity from suit when it passed the Equalization Act expressly making States subject to suits to enforce Title IX.

In light of the foregoing conclusion that Congress validly abrogated the States' immunity, it is unnecessary to resolve Jane Doe's alternative claim that the University affirmatively waived its Eleventh Amendment immunity by choosing to accept federal funds under Title IX.

II.  THE TITLE IX ISSUE

A.  Standard for Reviewing Motion to Dismiss

In reviewing a grant of dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, this Court must take as true all factual allegations in the plaintiff's pleadings and draw all reasonable inferences in her favor. Antonelli v. Sheahan, 81 F.3d 1422, 1427 (7th Cir. 1995). Such a motion may be granted only if it appears beyond a doubt from the pleadings that the plaintiff is unable to prove any set of facts that would entitle her to relief. Moss v. Healthcare Compare Corp., 75 F.3d 276, 279 (7th Cir. 1996). We review the district court's grant of a motion to dismiss de novo. Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 419 (7th Cir. 1994).

B.  Title IX Background

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. sec. 1681. As noted in Part I above, the Civil Rights Remedies Equalization Act, 42 U.S.C. sec. 2000d-7(a)(1), expressly made the States subject to suits to enforce the guarantees of Title IX.

It is well settled that sexual harassment of a student in a federally funded educational program

or activity, if it is perpetrated by a teacher or other employee of the funding recipient, can render the recipient liable for damages under Title IX. See Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 63-64, 76; Smith v. Metropolitan Sch. Dist. Perry Township, 128 F.3d 1014, 1021 (7th Cir. 1997). What is less clear, and what is before this Court today, is whether a school (or other educational fund recipient) can be liable for failing to take prompt, appropriate action to remedy known sexual harassment of one student by other students. Three courts of appeals have considered the question, with two finding no liability, see Davis v. Monroe County Bd. of Educ., 120 F.3d 1390 (11th Cir. 1997) (en banc); Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006 (5th Cir. 1996), certiorari denied, 117 S. Ct. 165, and one finding such liability if the school knew or should have known that the harassment was occurring, see Brzonkala v. Virginia Polytechnic Inst. & State Univ., 132 F.3d 949 (4th Cir. 1997). Further, a number of district courts have found such liability to exist under Title IX. See, e.g., Doe v. Londonderry Sch. Dist., 970 F. Supp. 64, 74 (D.N.H. 1997); Nicole M. v. Martinez Unified Sch. Dist., 964 F. Supp. 1369, 1377 (N.D. Cal. 1997); Bruneau v. South Kortright Cent. Sch. Dist., 935 F. Supp. 162, 173 (N.D.N.Y. 1996); Wright v. Mason City Community Sch. Dist., 940 F. Supp. 1412, 1419-1420 (N.D. Iowa 1996); Bosley v. Kearney R-1 Sch. Dist., 904 F. Supp. 1006, 1023 (W.D. Mo. 1995).

The district court in the present case, ruling without consideration of any court of appeals decisions on the issue,/7 held that the University could be liable for failing to take action to address Doe's harassment, but only if Doe alleged (as the court believed she had not done) that school and University officials' failure to respond "resulted from the University's sexual discrimination against her." In other words, the court held that the University's allegedly intentional failure to act in the face of knowledge of the sexual harassment was not sufficient to sustain Title IX liability; in the court's view, Doe needed to allege that the failure arose out of an intent by the University to discriminate on the basis of sex.

For reasons set forth below, this Court holds that a Title IX fund recipient may be held liable for its failure to take prompt, appropriate action in response to student-on-student sexual harassment that takes place while the students are involved in school activities or otherwise under the supervision of school employees, provided the recipient's responsible officials actually knew that the harassment was taking place. We reject the district court's further requirement that plaintiffs in such cases plead or prove that the

recipient, or any of its officials, failed to respond as a result of sexually discriminatory intent. The failure promptly to take appropriate steps in response to known sexual harassment is itself intentional discrimination on the basis of sex, and so, once a plaintiff has alleged such failure, she has alleged the sort of intentional discrimination against which Title IX protects.

C.   Title IX Liability

Because today's holding is inconsistent with the decisions of two of the three other courts of appeals that have directly addressed the issue, it is appropriate that this Court should explain the grounds for its disagreement with those decisions. The Fifth Circuit in Rowinsky, 80 F.3d at 1006, held that a school's alleged failure to respond sufficiently to sexual harassment of a student by other students could not incur liability under Title IX. The court considered the pertinent question to be whether the school could be held liable for the acts of third persons (the harassing students) who were not its agents. See id. at 1011 (noting that when a student is the harasser, "a theory of respondeat superior has no precedential or logical support"); id. at 1012 (stating that Title IX's language "does not support an inference that the statute applies to the conduct of third parties" and noting factors that weigh in favor of imposing liability "only for the acts of grant recipients").

As a result of this analysis, the Rowinsky court concluded that the only way in which the plaintiff could state a cause of action under Title IX based on sexual harassment by other students would be by showing "that the school district responded to sexual harassment claims differently based on sex" by, for instance, "treat[ing] sexual harassment of boys more seriously than sexual harassment of girls." Id. at 1016. Such a showing, the court believed, would be sufficient to show that the school itself discriminated on the basis of sex in its response to the complaints.

With respect, the Fifth Circuit's analysis fundamentally misunderstands the nature of the claim that plaintiffs in this kind of case advance. See Doe v. Petaluma City Sch. Dist. (Petaluma II), 949 F. Supp. 1415, 1421 (N.D. Cal. 1996). Jane Doe does not ask that the defendant be held liable for the acts of the harassing students; rather, she asks that it be held liable for its own actions and inaction in the face of its knowledge that the harassment was occurring. Were Doe in fact requesting that the harassing students' actions be imputed to the University under agency principles, then her claim would be properly dismissed. See Smith, 128 F.3d at 1034 ("Agency principles . . .

cannot impute discriminatory conduct of an employee to the 'program or activity'" under Title IX.). Instead, Doe alleges that responsible school and University officials knew of the harassment and failed to take measures to address it. "Thus, [the alleged] institutional liability rest[s] on the institution's actions" rather than those of the harassers. Id. at 1022 (discussing Franklin, 503 U.S at 60). The Fifth Circuit's agency-based analysis, therefore, does not resolve the issue.

Moreover, the Rowinsky court's demand that a plaintiff such as Jane Doe, in order to state a Title IX cause of action, allege and show that the school reacted differently to sexual harassment claims made by girls and boys misunderstands sexual harassment itself. This Court has noted in the Title VII context that the arguments underpinning the Rowinsky requirement "interpret sex discrimination in too literal a fashion." McDonnell v. Cisneros, 84 F.3d 256, 260 (7th Cir. 1996). As we recognized in that case, occasional exceptions do not alter the rule that sexual harassment is an evil that affects mostly women and girls. For this reason, it must be exceedingly rare that a school receives any complaints of sexual harassment from its male students. The Fifth Circuit's rule would leave schools completely free to ignore the more frequent complaints of sexual harassment from girls, while imposing only the minimal cost that such schools would be required likewise to ignore any complaints they might receive from their male students. See Petaluma II, 949 F. Supp. at 1421.


1.  The Eleventh Circuit's Spending Clause Analysis

Apparently recognizing these fatal flaws of the Rowinsky opinion, the Eleventh Circuit in its en banc opinion in Davis took care not to characterize the issue as one of liability for the acts of third parties. It also did not echo the dictum that a plaintiff could only state a claim by showing differential treatment of complaints by boys and girls. The court properly recognized that the school's allegedly discriminatory conduct lay in "fail[ing] to take measures sufficient to prevent a non-employee from discriminating against [the plaintiff]." Davis, 120 F.3d at 1401. With this understanding, the court proceeded to analyze whether a school could properly face Title IX liability for such a failure.

The Davis court began by finding that Title IX was enacted pursuant to the Spending Clause of the Constitution (art. I, sec. 8, cl. 1). See id. at 1398. From that premise, it next concluded that the proper inquiry to determine whether the school could be held liable was "whether Congress gave the

[school] Board unambiguous notice that it could be held liable for failing to stop [the] harassment." Id. at 1399. This Court held in Part I above that Congress enacted Title IX and applied it to the States pursuant to its powers under both the Spending Clause and Section 5 of the Fourteenth Amendment. While the Eleventh Circuit's approach is certainly relevant, it is not sufficient to conclude the inquiry.

In its Spending Clause analysis, the Eleventh Circuit correctly observed that "[w]hen Congress enacts legislation pursuant to the Spending Clause, it in effect offers to form a contract with potential recipients of federal funding." Id. (citing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17). As a general matter, the result of this contractual analogy is that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." Pennhurst, 451 U.S. at 17. In light of this requirement, the Eleventh Circuit inquired whether the defendant school board had been unambiguously put "on notice" that it might be liable for failing to respond to sexual harassment that it knew was taking place.

By relying upon the unambiguous statement rule of Pennhurst, the Eleventh Circuit ignored a more recent Supreme Court holding on the matter. In Franklin, 503 U.S. at 74-75, the Court held that where the discrimination alleged to have violated Title IX is intentional, the "notice problem does not arise." See Davis, 120 F.3d at 1414 (Barkett, J., dissenting). Title IX, the Supreme Court held, placed on schools the duty not to discriminate on the basis of sex; when a school violated that duty, it could be held liable despite the fact that the Court had not previously imposed a similar remedy for the kind of Title IX violation at issue. See Franklin, 503 U.S. at 75 (holding monetary damages remedy against school district appropriate where school officials knew about teacher's sexual harassment and abuse of student).

In the case before the Court today, Jane Doe alleges that University High's failure or refusal to take prompt and appropriate action in response to her complaints of sexual harassment was intentional sexual discrimination. In other words, the allegation assumes that the combination of knowledge that sexual harassment is occurring in activities under the school's control and intentional failure to take prompt, appropriate action (such as investigation and, if warranted, disciplinary measures) is presumably, perhaps even necessarily, a manifestation of intentional sex discrimination. See Smith, 128 F.3d at 1028 (noting that "a School District or School Board that 'knew' and failed to respond to sex discrimination would

act with the intent required to suffer a monetary judgment under the Spending Clause"); id. at 1042 (Coffey, J., concurring) (same). After all, what other good reason could there possibly be for refusing even to make meaningful investigation of such complaints, as Jane Doe alleges University High officials did in this case?

School and University officials were unquestionably aware that Title IX subjected the school to liability for intentionally discriminating against or denying educational benefits to students on the basis of sex. There is also no question that the campaign of harassment that Doe alleges was sufficient to deny her the full benefit of her education and subject her to discrimination at the school. If, as alleged, school and University officials knew about the harassment and intentionally failed, and indeed flatly refused in some instances, to take steps to address it, then the plea that the institution was not "on notice" that such failure could subject it to Title IX liability rings hollow.

2.  Fourteenth Amendment Analysis

Part I of this opinion held that Congress enacted Title IX and extended it to the States in part pursuant to Section 5 of the Fourteenth Amendment. In so holding, this Court concluded that the Supreme Court's admonition in Pennhurst against "quickly attribut[ing] to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment," Pennhurst, 451 U.S. at 16, was not pertinent to resolving the question under which of its powers Congress acted in passing and extending Title IX. The warning in Pennhurst is, however, most certainly relevant to the present inquiry, which is whether Title IX imposes upon recipients liability for certain types of actions or inactions.

In Pennhurst, the Supreme Court declined to conclude that Congress, in passing the Developmentally Disabled Assistance and Bill of Rights Act, had intended to use its Section 5 powers to impose an obligation on States to provide and pay for certain kinds of treatment to the mentally disabled. Id. at 15-17. The Court noted that previous cases in which it had found that Congress did create rights and obligations pursuant to Section 5 involved express articulations of intent by Congress. Id. at 16. The Court further stated that "[t]he case for inferring intent [to create enforceable rights] is at its weakest where . . . the rights asserted impose affirmative obligations on the States to fund certain services, since we may assume that Congress will not implicitly attempt to impose massive financial

obligations on the States." Id. at 16-17. The Court contrasted such impositions of affirmative obligations with statutes that "simply prohibit[] certain kinds of state conduct." Id. at 16; see Illinois Dep't of Public Aid v. Sullivan, 919 F.2d 428, 434 (7th Cir. 1990) (finding that Pennhurst did not bar imposition of prohibitions on State, in part because "[t]he regulations in question . . . imposed no new, affirmative obligations on [the State]").

The right Jane Doe asserts in this case would impose no affirmative funding obligations on the States. It would merely prohibit States, in their capacity as administrators of educational programs receiving Title IX funds, from failing to respond to sexual harassment that they knew was occurring. Cf. Timmer v. Michigan Dep't of Commerce, 104 F.3d 833, 840-841 (6th Cir. 1997) (inferring intent to enact Equal Pay Act pursuant to Fourteenth Amendment powers in part because it "simply prohibit[s] certain kinds of state conduct," rather than imposing financial obligations).

In any event, this Court does not read Pennhurst to stand for the proposition that Congress may never impose duties upon the States pursuant to Section 5 of the Fourteenth Amendment in the absence of a clear, unambiguous statement that it is imposing those precise duties. Clarity in legislative drafting is a goal to which this Court willingly subscribes. Congress need not, however, spell out in advance every situation to which it wishes a statute to apply. As we observed nearly a decade and a half ago, the question of whether Congress created enforceable rights in the first instance is very different from questions concerning "the scope and interpretation" of those rights. American Hosp. Assoc. v. Schweiker, 721 F.2d 170, 183 (7th Cir. 1983) (upholding community service and uncompensated care requirements imposed on federally funded hospitals by Department of Health and Human Services regulations pursuant to Hill-Burton Act), certiorari denied, 466 U.S. 958. This Court noted in Schweiker that the defendant hospitals conceded that the statute created enforceable obligations; only the scope of the obligations was at issue. See id. Similarly, no party to the present case could seriously dispute that Title IX imposes obligations upon schools that receive federal funds to avoid discrimination on the basis of sex, or that students such as Jane Doe may sue to enforce those obligations. The issue is whether those obligations' scope is wide enough to include the kind of liability Doe seeks to impose. Pennhurst is not a bar to inquiry into that question. If the language and history of Title IX and its extension to the States fairly support liability under the theory Jane Doe advances, then this Court may conclude that Congress acted

pursuant to Section 5 of the Fourteenth Amendment to impose such liability.

In its Spending Clause inquiry, the Eleventh Circuit looked primarily to the express terms and legislative history of Title IX. Finding no mention in the legislative history of student-on-student sexual harassment "or the related issue of school discipline," Davis, 120 F.3d at 1397, the court concluded that schools were not "on notice" that they might be held liable for failing properly to address sexual harassment by students, id. at 1401./8

Although we have concluded herein that Title IX is not exclusively a Spending Clause enactment (and that the notice issue does not arise, given the intentional nature of the discrimination alleged), the Davis court's analysis of whether the statute imposes liability provides a starting point for our Fourteenth Amendment inquiry. Unfortunately, the Eleventh Circuit made the mistake of focusing too narrowly on the statute and the legislative history, ignoring both case law and the meaning attached to Title IX by the federal agency responsible for its enforcement. As the dissenting judges in Davis observed, the language and legislative history of Title IX do not deal with teacher-on-student sexual harassment, any more than they do student-on-student harassment. See id. at 1413-1414 (Barkett, J., dissenting). Yet the Supreme Court has explicitly recognized that Title IX creates a cause of action based upon teacher-on-student sexual harassment. See Franklin, 503 U.S. at 60.

Indeed, the very principle that Title IX confers a private right of action for any sort of violation was not explicit in the text or legislative history; it became law only when the Supreme Court decided that Title IX implied such a right of action. See Cannon v. University of Chicago, 441 U.S. 677, 688-689; see also Franklin, 503 U.S. at 71 (noting that, given fact that right of action was inferred by Court in Cannon, prior legislative history and statutory text were not helpful in deciding whether money damages were available). This Court must, therefore, look to judicial decisions to help it determine whether Title IX imposes liability for the University's failure to address appropriately sexual harassment by its students.

The Supreme Court has declared that Title IX is to be given "a sweep as broad as its language." North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 521. That language, in turn, speaks in terms of safeguarding individual students' rights: "No person . . . shall be excluded . . . , be denied . . . benefits . . . , or be subjected to

discrimination . . . ." 20 U.S.C. sec. 1681. As the dissenting judges in Davis pointed out, "[t]he absolute prohibition contained in the text is framed solely in terms of who is protected." Davis, 120 F.3d at 1412 (Barkett, J., dissenting). Giving this statutory language the "broad sweep" required by North Haven certainly supports the proposition that a school may be liable for refusing to act upon its responsibility to operate a program in which all persons are free from the kind of exclusion and discrimination the statute forbids.

Beyond interpretation of the statutory language itself, however, federal courts look to cases decided under Title VII to inform analysis under Title IX. See, e.g., Preston v. Commonwealth of Virginia ex rel. New River Community College, 31 F.3d 203, 206 (4th Cir. 1994); Lipsett v. University of Puerto Rico, 864 F.2d 881, 896-897 (1st Cir. 1988); Mabry v. State Bd. of Community Colleges & Occupational Educ., 813 F.2d 311, 316 n.6 (10th Cir. 1987), certiorari denied, 484 U.S. 849. Although Title VII is most closely analogous to Title IX actions involving discrimination against educational employees, see Preston, 31 F.3d at 206, Title VII cases are also helpful in addressing other claims of sexual discrimination under Title IX. See, e.g., Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 248-249 (2d Cir. 1995) (applying Title VII analysis to student's Title IX claim against school involving sexual harassment by teacher). The very definition of sexual harassment that is implicit in this discussion and that of the other courts that have addressed it in the educational context comes from Title VII. See Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 67 (defining actionable sexual harassment under Title VII). The Supreme Court, in recognizing that sexual harassment of students by teachers could give rise to a Title IX cause of action against the school, cited Meritor, a Title VII case. See Franklin, 503 U.S. at 75. Broadly speaking, there is no reason why students such as Jane Doe should be afforded a lesser degree of protection against such "hostile environment" discrimination than adult workers in the employment setting regulated by Title VII.

This Court recently held that, because of differences in the language and history of Title IX and Title VII, cases decided under the latter should not be construed to impose Title IX liability upon schools for the acts of their employees on the basis of agency principles. See Smith, 128 F.3d at 1034. Jane Doe's argument in this case uses Title VII cases for a different purpose, however--to support the conclusion that schools may be held directly liable under Title IX for their own failure to respond appropriately to sexual harassment of which they have actual

knowledge. Such failure, Doe contends, renders the University directly liable for its own intentional discrimination on the basis of sex. Thus the holding in Smith that Title VII agency-based principles do not apply in Title IX cases does not preclude our use of Title VII precedents here.

One problem with borrowing so liberally from Title VII law in interpreting Title IX may be that under Title VII prospective litigants are required to proceed through a federal administrative agency, the Equal Employment Opportunity Commission (EEOC), before filing suit in federal court./9 See Patterson v. McLean Credit Union, 491 U.S. 164, 180. This requirement is intended to promote the resolution of unlawful employment practice claims "through conciliation rather than litigation." Id. Because no comparable administrative review mechanism exists for suits filed under Title IX, one might infer that Congress did not contemplate that courts would recognize as broad a range of causes of action under Title IX as under Title VII. Perhaps the absence of agency review means that this Court should not look to Title VII cases to inform its analysis of Jane Doe's Title IX claim.

On the other hand, private citizens have possessed a right to bring suit under Title IX for over eighteen years. See Cannon, 441 U.S. at 688-689. For at least five of those years, students have had a cause of action against schools based on sexual harassment by school employees. See Franklin, 503 U.S. at 63-64, 76. As noted above, for much of that time courts, including the Supreme Court, have been using Title VII precedent in analyzing Title IX suits. In all those years, Congress has not seen fit to institute a requirement of administrative review or conciliation for private suits under Title IX. Yet nothing indicates that the federal courts have seen an overwhelming flood of such suits. Nor does the species of Title IX liability for which Jane Doe asks in this case threaten to produce such a flood. Courts are free to use the means provided by Federal Rules of Civil Procedure 12 and 56, among others, to dispose of suits that lack merit. Congress, for its part, is free to impose a requirement comparable to the one under Title VII if it so desires. The absence of an administrative review requirement does not discourage the use of Title VII precedents in cases under Title IX.

Under Title VII standards, "an employer who has reason to know that one of his employees is being harassed in the workplace by others on grounds of race, sex, religion, or national origin, and does nothing about it, is blameworthy." Hunter v. Allis-Chalmers Corp., Engine Div., 797 F.2d 1417, 1422 (7th Cir. 1986). So long as the harassment is such that "the employer could have prevented [it] by reasonable care in hiring, supervising, or if

necessary firing the [harasser]," the employer is "directly liable (that is, independently of respondeat superior)." Id. Translated to the Title IX setting, this standard would mean that the University is liable for harassment by its students, regardless of the fact that students are not agents of the school, so long as it knew or had reason to know about the harassment and could have prevented some or all of it by taking appropriate action in response. The absence of an agency relationship is simply irrelevant, given our holding that the liability Jane Doe seeks is direct, rather than agency-based. Although we do not adopt, for the reasons given in Smith, 128 F.3d at 1028-1029, the Title VII "knew or should have known" standard articulated in cases such as Hunter, we do borrow that case's theory of direct liability.

This view of Title IX liability also takes into account the interpretations of the Department of Education's Office of Civil Rights (OCR), the federal agency charged with enforcing Title IX. Although OCR's interpretation of Title IX is not entitled to strict deference from this Court, see id. at 1033-1034, it merits our consideration. The OCR's final policy guidance on the matter states:

[A] school's failure to respond to the existence of a hostile environment within its own programs or activities permits an atmosphere of sexual discrimination to permeate the educational program and results in discrimination prohibited by Title IX. Conversely, if, upon notice of hostile environment harassment, a school takes immediate and appropriate steps to remedy the hostile environment, the school has avoided violating Title IX. Thus, Title IX does not make a school responsible for the actions of harassing students, but rather for its own discrimination in failing to remedy it once the school has notice.

Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,039-12,040 (1997).

The Eleventh Circuit's opinion in Davis ignored this policy statement (although Judge Tjoflat addressed it in a footnote to the portion of the opinion that is his alone, see Davis, 120 F.3d at 1404 n.23 (noting that the guidelines "issued after the alleged harassment" in the case)). It is certainly relevant that the OCR's final Guidance had not been issued at the time the harassment was taking place. The Guidance, however, reflects longstanding OCR policy, as demonstrated by official Letters of Finding dating as far back as 1989. The Fifth Circuit in Rowinsky determined that such Letters are not entitled to deference, as they "are promulgated during investigations of specific

institutions, and their purpose is to compel voluntary compliance by an offending institution." Rowinsky, 80 F.3d at 1015. Where, as here, the Letters of Finding consistently indicate that, in the words of one of them, "[a] district which is aware that its students are being subjected to sexual harassment has a duty under Title IX to take prompt and effective action to stop it," Letter of Finding of John E. Palomino, Regional Civil Rights Director, Region IX (May 5, 1989), Docket No. 09-89-1050, there is no reason not to consider the Letters as evidence that the later Policy Guidance did indeed reflect long-existing OCR policy.

It is clear, then, that Title VII case law and the interpretations of the responsible federal agency support the imposition of Title IX liability for the University's failure to respond promptly and appropriately to the sexual harassment of Jane Doe. Furthermore, imposing such liability best serves the anti-discrimination goal that Congress indisputably had in mind when it enacted Title IX and made it binding upon the States. Accordingly, this Court holds that Title IX does make schools liable for failure to respond promptly and appropriately to known student-on-student sexual harassment.

In holding that schools have a duty to take prompt and appropriate action to remedy student-on-student sexual harassment, this Court does not imply that schools must be successful in completely eradicating sexual harassment from their campuses and programs. School officials faced with knowledge of sexual harassment must decide how to respond, but their choice is not a binary one between an obviously appropriate solution and no action at all. Rather, officials must choose from a range of responses. As long as the responsive strategy chosen is one plausibly directed toward putting an end to the known harassment, courts should not second-guess the professional judgments of school officials. In general terms, it should be enough to avoid Title IX liability if school officials investigate aggressively all complaints of sexual harassment and respond consistently and meaningfully when those complaints are found to have merit.

D. Proper Standard for Notice that Harassment is Occurring

The holding that a school can be liable for failing to respond appropriately to sexual harassment makes it necessary to determine what constitutes sufficient notice to the school that such harassment is taking place. One court of appeals and one district court, borrowing from the Title VII context, have held that a school is liable for failing properly to address harassment

that it actually knew or should have known was occurring. Brzonkala, 132 F.3d at 949; Petaluma II, 949 F. Supp. at 1427. Several other district courts, in contrast, have adopted a standard that requires plaintiffs to allege and prove that the school officials actually knew of the harassment (rather than that they should have known). See Londonderry Sch. Dist., 970 F. Supp. at 74; Bruneau, 935 F. Supp. at 173; Wright, 940 F. Supp. at 1419-1420; Bosley, 904 F. Supp. at 1023.

In Smith, this Court rejected Title IX liability for teacher-on-student sexual harassment based on a "knew or should have known" standard and adopted instead a requirement of actual knowledge. Smith, 128 F.3d at 1034 (holding that school district can be liable "only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so") (quoting Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 660 (5th Cir. 1997)). We see no reason to adopt a different standard for cases, such as this one, in which the alleged harassment is student-on-student.

The actual knowledge standard is sufficient to resolve the case before the Court today, because Doe alleged that the University actually knew of the campaign of harassment against her. Indeed, counsel for the University conceded at oral argument that school officials knew of at least some of the incidents of sexual harassment. The parties agree that school officials on one occasion suspended some of the male students involved and took other actions in response to the harassment. Such responses preclude any argument that the officials did not have actual knowledge.

Furthermore, the requirement of actual knowledge is an appropriate limitation upon the liability to which suits based on student-on-student harassment subject schools. It will prevent schools from being blind sided by liability based upon events that officials did not even know were taking place. Such a requirement does not place too severe a burden on potential plaintiffs. All that is required is that they report the alleged harassment to responsible school officials, thus giving the school a chance to respond before it is hauled into court.

CONCLUSION

Jane Doe has alleged that she was subjected to hostile environment sexual harassment. As noted above, Doe also alleged (and the University concedes) that school and University officials had actual knowledge of that harassment. In addition, Doe has alleged facts that would allow a jury to find that the University failed to respond promptly

and appropriately to her complaints.

For the reasons set forth in Part I of this opinion, the district court's denial of the University's motion to reconsider on the basis of Eleventh Amendment immunity is affirmed. Because the plaintiff, Jane Doe, alleged facts sufficient to support each element of her claim that the University violated Title IX, the district court's dismissal of her Title IX cause of action against the University pursuant to Federal Rule of Civil Procedure 12(b)(6) is hereby reversed. The case is remanded to the district court for further proceedings consistent with this opinion.

FOOTNOTES

/* Because it conflicts with the decisions of other Circuits, this opinion has been circulated among all judges of this Court in regular active service in accordance with Seventh Circuit Rule 40(e). A majority of judges did not favor rehearing en banc.

/1 Because the district court dismissed Doe's Title IX cause of action pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must take as true all factual allegations in Doe's complaint and draw all reasonable inferences in her favor. See Antonelli v. Sheahan, 81 F.3d 1422, 1427 (7th Cir. 1995). The facts stated in this opinion reflect that requirement.

/2 The University's Eleventh Amendment immunity defense is a question of the federal courts' subject matter jurisdiction over the action. The University was therefore entitled to raise the issue at any stage of the litigation. See Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

/3 The Equalization Act states in relevant part, "A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of . . . title IX." 42 U.S.C. sec. 2000d-7(a)(1).

/4 Section 5 of the Fourteenth Amendment provides, "The Congress shall have power to enforce, by appropriate legislation, the provisions of [the Amendment]."

/5 In passing, however, it is worth noting that Jane Doe's briefs to this Court point out several instances in the legislative history where members of Congress refer to Title IX as an extension of Fourteenth Amendment protections.

/6 Gregory, too, interpreted the substantive reach of

a statute, rather than divining the source of Congress' power. The question in Gregory was whether Congress intended the Age Discrimination in Employment Act to apply to appointed state court judges. See Gregory, 501 U.S. at 455.

/7 The district court's Order dismissing Doe's Title IX claim was issued on March 29, 1996. The Fifth Circuit decided Rowinsky, 80 F.3d at 1006, four days later, on April 2. The Eleventh Circuit's panel decision in Davis, 74 F.3d 1186 (11th Cir. 1996), which found liability without the necessity of pleading that school officials were motivated by discriminatory intent, was issued on February 14, 1996, but the district court did not mention the case in its Order. The Davis panel decision was subsequently vacated, 91 F.3d 1418 (11th Cir. 1996) (granting rehearing en banc and vacating panel decision), and the full Circuit reached the contrary result discussed in the text.

/8 In sections of the en banc opinion not joined by any other judge, the author of the majority opinion, Judge Tjoflat, went on to state that the possibility of schools' being subject to what he called "whipsaw liability" was a further indication that Title IX did not put schools on notice that they might face liability under the circumstances of the case. Davis, 120 F.3d at 1401. By "whipsaw" liability, Judge Tjoflat meant the danger that a school might be sued by a harassed victim if it failed to take action against the harasser, but might then be sued by the harasser if it expelled or otherwise punished him (or her). See id. at 1401-1406. As these statements do not represent the opinion of the court, it is not necessary to address them at length. It is worth pointing out, however, that other Congressional enactments in the anti-discrimination field subject parties to the possibility of similar dual liabilities. Under Title VII, for instance, an employer might face suit from a harassed employee if it fails to take steps to remedy a hostile environment, but might also be sued by the harasser (for instance, for wrongful termination) if it disciplines him.

/9 The EEOC reviews Title VII complaints of unlawful employment practices to determine whether reasonable cause exists to believe the charges are true. 42 U.S.C. sec. 2000e-5(b). If it determines that such cause does exist, the EEOC must "endeavor to eliminate any . . . alleged unlawful employment practice by informal methods." Id. The EEOC is empowered to institute civil suits itself or refer cases to the Attorney General for action. Id. sec. 2000e-5(f)(1). If the EEOC does not institute such a suit or refer the case, or if it determines that reasonable cause does not exist to support the charges, it must dismiss the case and notify the complaining party that he or she has the right to

sue in federal court. Id. In addition, the EEOC in many cases is required to give State enforcement agencies an opportunity to resolve the dispute. See id. secs. 2000e-5(c)-(d).

Coffey, Circuit Judge, concurring in part and dissenting in part.  I concur in the majority's conclusion but not in its reasoning; I dissent from the majority's standard of liability. Title IX does impose liability upon fund recipients for failing to take prompt, appropriate remedial action in response to complaints of student-on-student sexual harassment, provided that responsible officials had actual knowledge of such harassment. But only those remedial actions which clearly evidence intentional discrimination are actionable under Title IX. See Smith v. Metropolitan Sch. Dist., 128 F.3d 1014, 1028 (7th Cir. 1997). Doe's facts as pleaded are sufficient to state a claim within this standard. I write separately in an attempt to clarify certain ambiguities in the majority opinion, and at the same time raise several concerns about the analysis set forth therein. As the majority notes, we are only the second federal appellate court to date to impose Title IX liability in the context of peer-on-peer harassment; two other circuits, the Fifth and Eleventh, have rejected the concept altogether, see Davis v. Moore County Bd. of Educ., 120 F.3d 1390 (11th Cir. 1997) (en banc); Rowinski v. Bryan Indep. Sch. Dist., 80 F.3d 1006 (5th Cir.), cert. denied, 117 S. Ct. 165 (1996), and the "actual knowledge" test we adopt today is markedly different from the Fourth Circuit's negligence-based "knew or should have known" standard of liability. See Brzonkala v. Virginia Polytechnic Inst. & State Univ., 1997 WL 785529 (4th Cir. Dec. 23, 1997)./1 This is indeed a most contentious area of the law, one deserving of great scrutiny and forethought. I fear that the majority has perhaps been too hasty in interpreting Title IX when the financing of our nation's public educational institutions hangs in the balance due to limited tax dollars.

The statutory language itself should be the starting point in resolving any controversy arising under a federal statute. Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. sec. 1681(a) (1990). And while the peer-on-peer harassment issue implicated in this case is one of first impression for this Circuit, we have previously been called upon to interpret Title IX in a different context. In Smith v. Metropolitan

Sch. Dist. Perry Township, decided by this Court a mere few months ago, we concluded that "a school district can be liable for teacher-student sexual harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so." 128 F.3d at 1034 (emphasis added) (quoting Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 660 (5th Cir. 1997)). Admittedly, teacher-on-student harassment and student-on-student harassment are of an entirely different species./2 Nevertheless, Smith is helpful as a guide for determining when and if a school district might be held liable for one student's sexual harassment of another.

In Smith, Steve Rager, a male teacher at Southport High School in Indianapolis, Indiana, engaged in a sexual relationship with Heather Smith, then a seventeen-year-old female senior at Southport. After graduating, Smith apprised her parents of the affair and they, in turn, reported it to school officials. Two days later, Rager was suspended, informed that his services were no longer desired, and told that his teaching license would be terminated if he did not resign forthwith. Rager promptly submitted his resignation. Thereafter, the school district sent a letter to the Indiana State Board of Education recommending the revocation of Rager's teaching license. In the wake of these events, Smith brought suit against, among other parties, the Metropolitan School District Perry Township ("Metropolitan"), alleging that the district discriminated against her in violation of Title IX because school officials knew or should have known that sexual harassment was taking place and did nothing to prevent its continuance. Metropolitan filed a motion for summary judgment, which the trial court denied, opining that teacher-on-student sexual harassment under Title IX was to be measured pursuant to a negligence standard, and that the "facts could support the conclusion that the School Defendants should have known about the sexual harassment and taken prompt action to stop it." This Court reversed, and in so doing, reasoned that insofar as "Title IX was passed pursuant to Congress' Spending Clause power," monetary recovery was limited to remedying acts of "intentional discrimination."/3 Id. at 1028; see also Guardians Ass'n v. Civil Service Comm'n of New York, 463 U.S. 582, 599, 103 S. Ct. 3221, 3231 (1983). Such intent, we concluded, is present only where the defendant-school has "actual knowledge" of sexual harassment and fails to take appropriate action to end it. Smith, 128 F.3d at 1034. Because Metropolitan never possessed actual knowledge of Rager's and Smith's sexual liaison while it was taking place, there was no need for us to consider what constituted

"appropriate action."

In my view, Smith's "actual knowledge" requirement is the very basis of Title IX liability, and it transcends any differences that might exist between the nature of teacher-on-student and student-on-student sexual harassment. Both demand that the plaintiff establish intentional discrimination before Title IX liability will attach, and school officials cannot intend to discriminate against an individual unless they have actual knowledge of harassment in the first place./4 See id. at 1034 (explaining that "[w]here a grant recipient has no knowledge of alleged discrimination, it cannot be said to have intentionally discriminated against the plaintiff"). I join in that part of the majority holding that recognizes this very significant "actual knowledge" prerequisite to Title IX liability, and make special note that it is clearly reflected in the majority's standard, which reads, in part: "[A] Title IX fund recipient may be held liable for its failure to take prompt, appropriate action in response to student-on-student sexual harassment . . ., provided the recipient's responsible officials actually knew that the harassment was taking place." Maj. Op. at 15 (emphasis added). But while I agree with the general spirit of Title IX liability as set forth in the majority's "actual knowledge" test, I nevertheless have serious misgivings about other facets of the standard it proposes.

Although this Court has issued but one decision dealing with and defining the parameters of Title IX liability, that single case, Smith, leaves no doubt that Title IX forbids intentional discrimination only. I fear that a casual reader of today's majority opinion might very well argue that negligence concepts have somehow crept into our Title IX jurisprudence. It may indeed be true that "Doe has alleged facts that would allow a jury to find that the University failed to respond promptly and appropriately to her complaints" Maj. Op. at 30, but such a statement begs the question as to what constitutes a "prompt and appropriate" response--is it merely some action, however trite, suspension (as was done here), or expulsion of the harassing student? Of course, the answer thereto must lie somewhere beyond a negligence rubric, and hinges on the circumstances of the particular case. The issue is not whether a given school did enough to wipe out ongoing student-on-student sexual harassment--that is a negligence inquiry/5-- rather, the proper question is whether the responsive action taken was of such a nature that it effectively evinced the school's intent to perpetuate a sexually-hostile environment./6 In other words, if a school district acquired actual knowledge of peer-on-peer harassment and undertook

measures that it believed would achieve their desired result, but which fell short in doing so, one could hardly suggest that school officials intentionally discriminated against the complaining student unless their response was so de minimis that it evidenced an endorsement of the harassment, they somehow treated female complaints differently than male complaints, or vice versa,/7 or they departed from established policies and practices when punishing student harassers./8 This appears to be what the majority is attempting to get at when it states:

As long as the responsive strategy chosen is one plausibly directed toward putting an end to the known harassment, courts should not second-guess the professional judgments of school officials. In general terms, it should be enough to avoid Title IX liability if school officials investigate aggressively all complaints of sexual harassment and respond consistently and meaningfully when those complaints are found to have merit.

Maj. Op. at 28. I think a "meaningful" response, as Judge Cummings uses the term, can and should be interpreted very broadly to include any remedial action which is not so de minimis that it demonstrates an intent by school officials to discriminate against the complaining student on an improper basis. I would, therefore, prefer to raise the level of deference we should accord schools' remedial actions even beyond Judge Evans' observation that "[c]onsiderable deference . . . must be given to schools in meeting these demands, and a wide range of reasonable responses should be permitted" Evans Op. at 50 (emphasis added), and emphasize the word "considerable." Alternatively, if a school fails to take prompt remedial steps after having received actual notice of student-on-student harassment taking place during a school-sponsored and supervised activity, acquiescence could in such an instance be perceived as amounting to intentional discrimination.

The bases of liability I propose above, like many other aspects of this fast developing area of the law, may be new to Title IX, but that is not to say they are entirely foreign to our jurisprudence. Only one year ago, in Nabozny v. Podlesny, 92 F.3d 446 (7th Cir. 1996), we considered a student's claim of peer-on-peer harassment under 42 U.S.C. sec. 1983, as opposed to Title IX. And while sec. 1983 and Title IX do differ as to from whom relief might be obtained,/9 they are, in fact, quite similar with respect to how a court, proceeding without statutory or Supreme Court guidance, should go about construing claims brought pursuant to them, for "[b]oth statutes prohibit the same kind of conduct and provide compensatory and punitive damages as remedies . . . ." Waid v. Merrill Area

Pub. Sch., 91 F.3d 857, 862 (7th Cir. 1996) (emphasis added). Indeed, both Title IX and sec. 1983 forbid intentional sexual discrimination. That having been said, I believe it would be helpful to summarize the facts of Nabozny, which, in my opinion, arguably would have stated a cognizable claim under Title IX./10

Jamie Nabozny attended middle and high school in the Ashland Public School District in Ashland, Wisconsin. Nabozny, 92 F.3d at 449. From around the time he entered the seventh grade until he withdrew from Ashland High School in his junior year, Nabozny suffered not only continual harassment, but also physical abuse at the hands of his peers due to the fact that he was an avowed homosexual; his male classmates regularly referred to him as "faggot," struck and spit on him, performed a mock rape on him in a science classroom, as well as pushed him, forcing him to fall into a urinal. Id. at 451-52. After each of these incidents, Nabozny's parents met with Ashland High's Principal, Mary Podlesny, to report what had happened and identify the perpetrators. Id. at 451. And on each occasion, no action was forthcoming on the part of the school authorities; in fact, Podlesny's alleged responses ranged from stating, "boys will be boys," to telling Nabozny that "if he was 'going to be so openly gay,' he should 'expect' such behavior from his fellow students." Id. Nabozny eventually filed suit pursuant to sec. 1983 against Podlesny, among other parties, including the Ashland School District, alleging that the defendants violated his Fourteenth Amendment rights to equal protection and due process.

On appeal from the district court's entry of summary judgment in the defendants' favor, this Court reversed. In so doing, we explained that "[i]n order to establish liability under sec. 1983 [for an equal protection violation], Nabozny must show that the defendants acted with a nefarious discriminatory purpose," Id. at 453 (citation omitted), that is, "demonstrate intentional or purposeful discrimination." Id. at 454 (quoting Shango v. Jurich, 681 F.2d 1091, 1104 (7th Cir. 1982) (emphasis added)). And "[d]iscriminatory purpose," we stated, "implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." Id. at 454 (quoting Shango, 681 F.2d at 1104). Applying these sec. 1983 principles to the facts in Nabozny, we explained:

Nabozny has presented evidence that his classmates harassed and battered him for years and that school administrators failed to enforce their anti-harassment policies, despite his repeated pleas for

them to do so. If the defendants otherwise enforced their anti-harassment policies, as they contend, then Nabozny's evidence strongly suggests that they made an exception to their normal practice in Nabozny's case.

Therefore, the question becomes whether Nabozny can show that he received different treatment because of his gender. . . . Nabozny does allege . . . that when he was subjected to a mock rape Podlesny responded by saying "boys will be boys," apparently dismissing the incident because both the perpetrators and the victims were males. We find it impossible to believe that a female lodging a similar complaint would have received the same response.

. . . .

Moreover, Nabozny introduced evidence to suggest that the defendants literally laughed at Nabozny's pleas for help.

Id. at 454-55. Nabozny's message is unequivocal, and should not be lost in any attempt to differentiate between sec. 1983 and Title IX. Specifically, intentional discrimination can be manifested in an institution's: (1) complete failure to respond to allegations of peer-on-peer harassment; (2) its disparate treatment of male and female complaints thereof; and/or (3) its unexcused departure from established anti-harassment policies. Nabozny did not call upon this Court to address the fourth way in which a school's intent to discriminate might be demonstrated; namely, by taking remedial action which is so de minimis in nature that it might very well be considered an endorsement of sexual harassment.

In this case, Doe does not allege that University High School officials did nothing in response to her accusations of sexual harassment, nor that they previously had, much less would have, reacted differently to a male student's complaints thereof. Rather, the school suspended two of Doe's harassers for ten days each, and transferred another one of them out of Doe's biology class. Does such a response, which turned out to be unsuccessful in curtailing the boys' campaign of sexual harassment, circumstantially evidence the school's intent to discriminate against Doe? I think not, but that is an issue for the district court on a motion for summary judgment, or for the trier of fact at trial.

That having been said, I turn to another troubling aspect of the majority's standard; namely, that the majority, in imposing Title IX liability for peer-on-peer harassment which "takes place while the students are involved in school

activities or otherwise under the supervision of school employees" Maj. Op. at 15, advances an indefinite disjunctive test that casts far too broad a net upon the acts of students for which an institution might incur liability. In my view, only harassment that takes place while students are involved in school-sponsored activities, whether on or off school grounds (i.e., during scheduled classes, school-sanctioned athletic events, dances, field trips, or theatrical productions, to name a few), might conceivably provide cause for Title IX liability. Unlike the majority's standard, my test maintains Title IX's requisite relationship between the discrimination alleged and the school sought to be charged. For example, let us suppose that students within a public institution called "City Public High School" hold an annual dance entitled the "City Public High School Winter Formal." Notwithstanding the name of the event, it is not school-sanctioned, but is instead an entirely private gala that takes place at a suburban country club and is open to only a select group of invited students. The district neither provides funding for the affair nor assists in the organization, planning or supervision of it--every arrangement is exclusively made by and through the students. Once at the dance, a male student makes some unwanted sexual "passes" at a female classmate in attendance who, in turn, complains to her principal about it several days later. The school takes corrective action, but the same type of "harassment" occurs at next year's "Winter Formal." This time the young woman visits with her attorney, rather than the principal, and brings a Title IX action against the school district. While the majority's use of the loose term, "school activities," could possibly encompass this set of facts, I do not think that Title IX was enacted to capture a broad range of conduct of this nature. In my view, there must be established a true and meaningful nexus between the harassment alleged and the institution sought to be charged under Title IX. Where, as in the preceding hypothetical, a number of students attend an event which they have planned, financed and supervised without the assistance of school officials, I submit that the "connection" between the harassing conduct and the school district is far too tenuous to justify the imposition of Title IX liability. Simply put, the majority's use of the malleable term, "school activities," is too indefinite and all-inclusive, and could very well invite Title IX liability well beyond the parameters Congress envisioned, thus potentially expanding the number of situations in which student-on-student harassment is actionable. For this reason, I am of the belief that Title IX liability must be limited to harassment which takes place while students are involved in school-sponsored activities, as opposed to any function in which students participate, be it their own or that of another organization.

In the same vein, I disagree with the majority that Title IX liability alternatively arises for "harassment that takes place while the students are . . . otherwise under the supervision of school employees." Maj. Op. at 15. Once again, this language is too all-inclusive. Taken literally, the majority's standard could potentially impose Title IX liability if, after school hours or even during summer break, a male student visits the home of a female peer whose father happens to be a public school employee (i.e., a custodian or maintenance man), and sexually harasses her (assuming that the parent (school employee) was present to supervise the students' behavior)./11 The parent's "supervision" of his daughter and the harassing student is in such a case completely unrelated to his position as a school employee, and the harassment itself poses no relationship whatsoever to an educational "program or activity." The emphasis I am placing on the harassing conduct (i.e., under what circumstances it takes place) is not inconsistent with the notion that Title IX does not impute liability on educational institutions for the acts of students, but rather for the institutions' failure to respond promptly and appropriately to complaints of sexual harassment properly brought to their attention. If one student sexually harasses another and the harassee complains to school officials, the school will only be liable if: (1) it had actual knowledge of the harassment; (2) it fails to undertake prompt and appropriate remedial action; and (3) the harassment continues. Therefore, assuming that a school actually knew about student-on-student harassment and did not take prompt and appropriate remedial measures in response thereto, the true linchpin of Title IX liability is the actual act of continued harassment.

My belief that the majority has in this instance gone too far with its sweeping test is not only grounded in the strict language of Title IX, but also in my appreciation of the veritably impossible task imposed on school authorities of controlling the all-too-frequent reckless and unpredictable behavior of today's adolescents. The law does not allow minor children (under eighteen years of age) to consent to surgical procedures without parental approval because of their emotional immaturity./12 For this very reason, they are likewise prohibited from voting, going to war, purchasing alcohol or cigarettes, and even contracting./13 Is it not ironic then that these same minors have the ability to cast their school systems into dire financial straits due to sexual harassment driven by the same unalterable juvenile shortcoming? Much ink has been spilled in the name of explaining exactly why young adolescents are, or should be, denied certain legal rights and

privileges traditionally accorded to adults. In Bellotti v. Baird, 443 U.S. 622, 99 S. Ct. 3035 (1979), for example, the Supreme Court articulated its rationale for refusing to equate the constitutional rights of children with those of adults, stating:

[T]he Court has held that the States validly may limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences. These rulings have been grounded in the recognition that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them.

Id. at 635, 99 S. Ct. at 3044 (emphasis added). Indeed, most minors simply have not gained sufficient knowledge and experience in the affairs of life to exercise sound discretion and judgment. Behavioral scientists have likewise contributed to the cause of understanding what underlies society's belief that adolescents are poor decision-makers, and concluded that it may very well be attributable to minors' regular participation in dangerous activities, despite their appreciation of the risks involved. See Elizabeth Cauffman & Laurence Steinberg, The Cognitive and Affective Influences on Adolescent Decision-Making, 68 Temp. L. Rev. 1763, 1767, 1772 (1995). This stems, in large part, from "the adolescent['s] . . . view [of] himself or herself as unique and, moreover, invulnerable to harm." Id. at 1767 (emphasis added) (citing Daniel K. Lapsley & Michael N. Murphy, Another Look at the Theoretical Assumptions of Adolescent Egocentrism, 5 Developmental Rev. 201, 214-15 (1985)). It follows, then, that when a minor student sexually harasses his peer, he does not do so for want of knowledge that such behavior is wrong or socially unacceptable, but rather because of his cavalier attitude towards risk and a false inner sense of invincibility. School administrators have been, and shall continue to be, unable to alter this innate risk-loving nature of teenagers, and there is little reason why they should be burdened with this assignment when it comes to student-on-student sexual harassment.

The policies which underlie our law's prohibition against the participation of minors in those activities set forth above (i.e., voting, etc.) also argue against imposing Title IX liability for peer-on-peer harassment. I harken back to what the Supreme Court said in Bellotti--"that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." Bellotti, 443 U.S. at 635, 99 S. Ct. at 3044. That is, the law wisely limits

the decision-making ability of minors when the exercise of their own poor judgment creates costs which fall primarily on themselves. Our modern society is a litigious one, and although the cost of peer-on-peer harassment under Title IX will be borne by the school systems (vis-a-vis "deep-pocketed" taxpayers), it is the students who will ultimately suffer through reduced funding in their educational pursuits--this is precisely the type of situation in which the law should protect minors from their own foolish judgments. The fact of the matter is that Congress has enacted Title IX, and we have interpreted the statute to mandate that courts, in certain circumstances, not equate peer-on-peer sexual harassment with consenting to surgical procedures and the like. There is no reason to infer, however, from existing case law or legislative history that we must construe Title IX's text as broadly as possible, much as the majority has attempted herein. As I noted in Smith, being a reviewing federal appellate court, in contradistinction to a lawmaking body, "'we resolve[] . . . ambiguit[ies] not by invoking some policy that supersedes the text of the statute,' but rather by limiting ourselves to that meaning which a given text will reasonably bear." Smith, 128 F.3d at 1041 (Coffey, J., concurring).

Finally, I wish to point out that, contrary to what one might be led to believe by the majority opinion's heavy reliance on Title VII (see Maj. Op. at 24-27), this Court is not retreating from its position in Smith that Title IX and Title VII are not analogous statutes, and as such, the latter should not be used to enlighten our analysis under the former except in very limited circumstances. In Smith, we explained in unequivocal language that "it is helpful to look to Title VII to determine whether the alleged sexual harassment is severe and pervasive enough to constitute illegal discrimination on the basis of sex for purposes of Title IX," Smith, 128 F.3d at 1023, but went on and clearly stated that there existed no "'justifi[cation for] the importation of other aspects of Title VII law into the Title IX context.'" Id. (quoting Rosa H., 106 F.3d at 653). Thus, in light of Smith, which is the law of this Circuit, it is plainly improper for the majority to suggest that "[t]here is no reason why students such as Jane Doe should be afforded a lesser degree of protection against . . . 'hostile environment' discrimination than adult workers in the employment setting regulated by Title VII." Maj. Op. at 24. Intentional discrimination under Title IX is measured vis-a-vis an "actual knowledge" standard, whereas "the standard for employer liability [under Title VII] in cases of hostile-environment sexual harassment by a supervisory employee is negligence [(i.e., "knew or should have known")]." Jansen v. Packaging Corp. of America and Ellerth v.

Burlington Indus. Inc., 123 F.3d 490, 495 (7th Cir. 1997) (en banc) (per curiam), cert. granted in part by Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 876 (Jan. 23, 1998). These are two very separate and distinct tests which afford different degrees of protection to those individuals who bring claims pursuant to Title IX and Title VII. It follows then that Doe should not, as the majority now proposes, be entitled to the same degree of protection under Title IX as adult workers are in the employment setting under Title VII.

Because I am confident that Doe will not be the last student-on-student sexual harassment case to come before this Court, I close with the concern that the majority opinion, which I join only in part, has attempted to open the gates to Title IX liability wider than that statute's language reasonably allows, and it shall only be a matter of time before the floodwaters of litigation begin to rise. Allegations of peer-on-peer harassment are being levied at a fevered pitch even in the primary grades, and oftentimes for conduct that is nothing more than "child's play." Indeed, only one year ago a six-year-old, North Carolina first-grader was accused of sexual harassment after he kissed a female classmate. See Linda Chavez, Feminist Kiss Patrol is on the March, USA Today, Oct. 2, 1996, at 15A. More recently, school officials in Pittsburgh suspended a ten-year-old, fourth-grade student for two days because he, as his two "victims" put it, grabbed one of them from behind and subjected the other to an unwanted hug. Kid Stuff a Silly Sexual Harassment Charge Against a 10-Year-Old, Pittsburgh Post Gazette, Sept. 25, 1997, at A22. My point is simply that, absent Congressional or Supreme Court guidance in this area of the law, we must be mindful to approach it with an application of common-sense, combined with utmost reflection and study, so as not to let it get "out of control" for those individuals who must live by its mandate.

In Jansen, 123 F.3d at 543 (Coffey, J., concurring in part and dissenting in part), I noted that "[j]ust as the ill-advised expansion of the law in the [medical malpractice and products liability] areas has worked to the detriment of the average American citizen, so too will the expansion of employer liability in the Title VII context." The same goes for Title IX, but it will not just be the "average American citizen" who suffers in the form of higher taxes, for children in public schools are the ultimate recipients of federal educational funding--they are also the ones who lose when those monies are withheld. The cost of making school authorities guardians of acceptable social behavior outside of school-sponsored activities could be devastating, for Title IX, unlike Title VII, does not include a statutory ceiling on recoverable monetary damages. See 42

U.S.C. sec. 1981a(b)(3). In fact, merely defending against a multi-million dollar Title IX lawsuit can mean the difference between hiring five new teachers and discharging five existing ones, purchasing upgraded computers and making do with outdated machines, or expanding the library's collection and dropping a remedial reading program. I find it troubling that an emotionally-immature minor student has the ability to make this difference, thereby depriving his innocent peers of valuable learning opportunities. A very recent study by the International Association for the Evaluation of Educational Achievement revealed that our Nation's eighth-graders currently rank only twenty-eighth out of forty-one developed countries around the world in mathematics, and only seventeenth in science. See Peter Applebome, U.S. Students Just Average in Math, Science Rankings at a Glance, N.Y. Times, Nov. 21, 1996, at N1. A "National Report Card" on the condition of public education in the fifty states, released on January 8, 1998, likewise relates some discouraging news-- America's schools are not "making the grade." See Quality Counts '98, Educ. Wk., Jan. 8, 1998. Overall, the states received a "C+" grade for the amount of resources they allocated to education./14 Id. at 3. How can this be when most states are devoting more funds to education today than they did ten years ago? Id. The answer is simple: "too few of the additional dollars have reached classrooms." Id. (emphasis added). The easier it is to reach into our schools' coffers under Title IX, the faster these statistics shall plummet, and, in turn, the sooner we will have to bear the burden of a tragically undereducated society.

I do recognize that student-on-student harassment is a most serious issue, and echo the sentiments I expressed in my Smith concurrence, that "I am unalterably opposed to sexual harassment, which is both intolerable and wrong." Smith, 128 F.3d at 1041 (Coffey, J., concurring). And although perhaps the most appropriate forum to educate children on the iniquitousness of harassment, whether sexual or otherwise, is in the home, the fact of the matter is that Congress, by enacting Title IX, has placed the responsibility on educators to insure that it not be tolerated, and does not persist, in our schools. It is my belief that the "actual knowledge" standard, coupled with the ideas articulated herein, accurately captures the "intentional discrimination" which Title IX seeks to prohibit.

FOOTNOTES

/1 The majority incorrectly states that "today's holding is inconsistent with the decisions of two of the three other courts of appeals that have directly addressed the issue" of Title IX liability

for student-on-student sexual harassment. Maj. Op. at 15. Because this Court has adopted the aforementioned "actual knowledge" test in Title IX cases, our holding should be contrasted with, as opposed to likened to, all three of the decisions of those circuits, as neither the Fifth nor Eleventh circuit recognizes Title IX liability for peer-on-peer harassment, while the Fourth Circuit implores a negligence-based "knew or should have known" standard.

/2 As we all know, public school systems can pick and choose to employ whomever they wish as teachers and "filter out" any applicants with histories of sexual misconduct, while on the other hand they must educate every qualified child within their respective districts. Moreover, whereas adult educators have, or should have, the emotional maturity and experience to know what type of conduct oversteps the bounds of socially acceptable behavior, children, because of their youth, more often than not do not have the ability to exercise such sound judgment.

/3 Although we conclude today that Title IX was enacted pursuant to its Spending Clause powers as well as Section 5 of the Fourteenth Amendment, the fact remains that the statute prohibits intentional discrimination only.

/4 Because it is the threshold inquiry under Title IX, and is implicit in the discussion throughout the remainder of this opinion, I see no need to repeatedly reference the requirement that an educational institution must possess actual knowledge of alleged
sexual harassment before Title IX liability might attach.

/5 I am well aware, however, that an educational institution's pattern of "negligent" responses to complaints of peer-on-peer sexual harassment (i.e., responses that fail to evidence an endorsement of harassment) might under certain circumstances conceivably rise to the level of intentional discrimination. See, e.g., Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir.), cert. denied, 468 U.S. 1217, 104 S. Ct. 3587 (1983) (recognizing that a pattern of negligent responses can evidence "deliberate indifference").

/6 The majority hints that a school's response to complaints of harassment will only constitute "intentional discrimination" if it demonstrates an intent to foster a sexually hostile environment by stating that:

the combination of knowledge that sexual harassment is occurring in places or activities under the school's control and intentional failure to take

prompt, appropriate action (such as investigation and, if warranted, disciplinary measures) is presumably, perhaps even necessarily, a manifestation of intentional sex discrimination. After all, what other good reason could there possibly be for refusing even to make meaningful investigation of such complaints . . . .

Maj. Op. at 18-19 (citation omitted).

/7 Because I am of the opinion that intentional discrimination is manifested in a school's disparate treatment of female and male sexual harassment complaints, I agree with the Fifth Circuit's Rowinski decision to the extent that it concluded "a school district might violate title [sic] IX if it treated sexual harassment of boys more seriously than sexual harassment of girls, or even if it turned a blind eye toward sexual harassment of girls while addressing assaults that harmed boys." Rowinski, 80 F.3d at 1016. I disagree, however, with Rowinski's suggestion that this is the only way in which a plaintiff can demonstrate intentional discrimination under Title IX. The majority fails to make clear whether it objects to Rowinski in toto, including the "disparate treatment" concept, or if it, like myself, criticizes that case for simply being too limited in scope.

/8 "It is well settled law that departures from established practices may evince discriminatory intent." Nabozny v. Podlesny, 92 F.3d 446, 455 (7th Cir. 1996) (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267, 97 S. Ct. 555, 564-65 (1977)). And Title IX regulations presently require schools to adopt and publish grievance procedures for prompt and equitable resolution of sexual discrimination and/or harassment complaints, and to disseminate policies prohibiting such conduct. See 34 C.F.R. sec. 106.8. Thus, it in all probability would not be difficult for a trier of fact to determine whether school officials had "departed from established practices," and, resultingly, intentionally discriminated against a particular plaintiff, in violation of Title IX.

/9 Whereas a Title IX claim can only be brought against a grant recipient and not an individual, Smith, 128 F.3d at 1018-19, an action brought pursuant to sec. 1983 may lie against individuals.

/10 Of course, this Circuit now recognizes that "a plaintiff may not claim that an instance of intentional discrimination simultaneously creates causes of action under Title IX and under sec. 1983 and the Equal Protection Clause of the Fourteenth Amendment; the availability of a Title IX claim precludes the pursuit of a sec. 1983 claim."

Merrill Area Pub. Sch., 91 F.3d at 862 (citing Williams v. Sch. Dist. of Bethlehem, Pa., 998 F.2d 168 (3rd Cir. 1993), cert. denied, 510 U.S. 1043, 114 S. Ct. 689 (1994)).

/11 This example further assumes, of course, that school officials possessed actual knowledge that the harasser had previously engaged in harassing conduct.

/12 Because courts typically refer to individuals below the age of eighteen as "minors," see, e.g., Behnke v. Behnke, 103 Wis. 2d 449, 309 N.W.2d 21 (Ct. App. 1981), whereas developmental psychologists sometimes allude to them under the label, "adolescents," I shall use the two terms interchangeably when referring to children under eighteen years of age.

/13 A minor may, of course, enter into a contract with another, but "it is settled law . . . that a contract of a minor for items which are not necessaries is void or voidable at the minor's option." Halbman v. Lemke, 99 Wis. 2d 241, 245, 298 N.W.2d 562, 564 (1980) (citations omitted).

/14 The "report card" also issued the following overall state grades for the three respective categories: "Standards and Assessments"--(B); "Quality of Teaching"--(C); "School Climate"--(C-).

EVANS, Circuit Judge, concurring. I am pleased to join Judge Cummings' splendid opinion. I write separately only to offer a few observations as this case returns to the district court for further proceedings. Our bottom line is, as Judge Cummings writes, "that a Title IX fund recipient may be held liable for its failure to take prompt, appropriate action in response to student-on-student sexual harassment that takes place on the recipient's grounds or while its students are involved in school activities, provided the recipient's responsible officials actually knew that the harassment was taking place." (Slip op. at 15.) I support this holding and have nothing to add to Judge Cummings' effective analysis of why the Fifth and Eleventh Circuits' contrary view is flawed. But the devil here will be in the details.

It is vitally important to emphasize that this case is on appeal following a dismissal for failure to state a claim under Rule 12(b)(6). As such, we are required to assume all facts in the complaint to be true, but of course we cannot and do not vouch for their accuracy. The complaint in this case is a sprawling document--21 pages peppered with 114 separately numbered paragraphs. Seventy-one of the paragraphs are under the heading

"Facts." Although the complaint is excessively long and unnecessarily detailed, its gist is that our plaintiff, while a student at University High, faced an unrelenting campaign of verbal and physical sexual harassment perpetrated by a group of male students at the school and that the school officials did little or nothing to address the chaotic situation. What troubles me, and what will have to be addressed by the district court upon remand, is just what exactly did the school do here to address the situation and was what it did enough? The complaint, and the concession at oral argument that Judge Cummings notes (slip op. at 29), give a hint that the school did something to ameliorate the situation--it suspended two boys. Tested later on summary judgment, that just might turn out to be enough to satisfy our command that a school must take "prompt and appropriate" action to combat known sexual harassment.

Schools do not have to eliminate sexual harassment by students upon other students. That would be an impossible task, for schools are full of all sorts of kids, and every school has its share of buffoons, yokels, and dunderheads of all stripes. And unlike harassers in the work place, students can't be fired. Schools are also full of kids with raging hormones who may be crude and insensitive when dealing with students of the opposite sex. So although I agree that Title IX requires schools receiving federal funds to be engaged in combating student-on-student sexual harassment, what I think is required is that a school not turn a blind eye to a sexually hostile environment. Considerable deference, I believe, must be given to schools in meeting these demands, and a wide range of reasonable responses should be permitted.

Statement of Easterbrook, Circuit Judge, respecting the denial of rehearing en banc. The panel circulated its opinion before release under Circuit Rule 40(e) so that we could decide whether to create a conflict among the circuits on the question whether the eleventh amendment to the Constitution, as understood in Seminole Tribe v. Florida, 116 S. Ct. 1114 (1996), prevents Congress from providing that suits under Title IX of the Education Amendments of 1972, 20 U.S.C. secs. 1681-88, may be heard in federal court. Our panel holds that Title IX is based in part on the fourteenth amendment, so that the principle of Fitzpatrick v. Bitzer, 427 U.S. 445 (1976), applies. Sex discrimination by public schools is a subject within the legislative power under sec.5 of the fourteenth amendment, and Congress need not catalog the grants of power under which it legislates; courts do not remand statutes for

better statements of reasons. None of the active judges questions the panel's decision on this issue.

After the panel circulated its draft opinion, some judges expressed concern about a different question: under what circumstances does inaction by a public school that has received reports of one pupil's misconduct toward another amount to sex discrimination? Taking sides in a second conflict among the circuits, the panel held that failure to protect pupils from private aggression is a species of discrimination. This is the original meaning of equal protection of the laws. If a state protects white or male residents against crimes (or torts), it must protect the black or female residents as well. Some courts of appeals seem to have forgotten this, but the panel has not--and again none of the active judges favors review of this question by the full court. What has led to the dissent from the majority's decision to let the panel issue its opinion is not a belief that we should follow one of the other circuits but concern about how to implement the principle that schools must protect their female pupils against private assaults. What level of knowledge is required? How effective must intervention be? These are difficult questions, on which Title IX offers no guidance--and on which none of the other circuits has yet offered a view.

One would suppose from 20 U.S.C. sec.1682 that issues posed but not answered by Title IX are to be resolved by the federal aid-granting agencies, after their regulations have been reviewed by the President, with judicial review to follow under 20 U.S.C. sec.1683. Use of a private right of action for damages to short-circuit this deliberately cumbersome process not only replaces administrative negotiation with damages liability (the source of the dissent's principal concern) but also leaves the court substantively at sea. Is it wise to jump the gun in this fashion? Why not say that, until regulations have specified vital details, damages are inappropriate? Cf. Blessing v. Freestone, 117 S. Ct. 1353 (1997). Although Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992), holds that there is an implied private right of action for damages to enforce Title IX (an action directly under Title IX, not via 42 U.S.C. sec.1983 and Maine v. Thiboutot, 448 U.S. 1 (1980)), it does not command the inferior courts to award damages in problematic cases before school districts know what is expected of them. Franklin and its precursor Cannon v. University of Chicago, 441 U.S. 677 (1979), are about remedies: they add private damages to the statutory approach of terminating federal funding. Cannon infers the remedy from the right; it does not dispense with the need to find a right clear enough to be enforceable. Rulemaking under sec.1682, rather than adjudication, should be

the source of gap-filling rules. Otherwise the remedy breeds its own right. Notice-and-comment rulemaking with approval of the President, not events-and-damages "rulemaking" in common law fashion, is the method specified in sec.1682. The absence of rules defining with precision the schools' obligations counsels hesitation, even if it does not foreclose damages.

As a standard that school districts must satisfy until regulations have been issued--alternatively, that pupils must meet if they want damages as opposed to administrative relief--Chief Judge Posner's proposal makes a great deal of sense. But I do not think it necessary or appropriate to hear this case en banc, for we do not know whether the choice of standard matters. Anything we say on the subject may be advisory--and unnecessary too, for none of the three judges on the panel clearly rejects an analogy to the deliberate-indifference standard under Farmer v. Brennan, 511 U.S. 825 (1994). Our last effort to resolve an issue of this kind in the abstract did not fare well. See Jansen v. Packaging Corp. of America, 123 F.3d 490 (7th Cir. 1997) (en banc), cert. granted under the name Burlington Industries, Inc. v. Ellerth, 118 S. Ct. 876 (1998). After we have learned how (if at all) the differences among standards matter, and the parties have had an opportunity to brief the subject with a recognition of its significance, we will be able address the question, if that still appears to be necessary. It would be premature to hear this issue en banc now.

Posner, Chief Judge, with whom Flaum and Manion, Circuit Judges, join, dissenting from denial of rehearing en banc. The issue of a school's liability under 20 U.S.C. sec. 1681(a) (which forbids sex discrimination by schools that receive federal financial aid) for the sexual harassment of one student by another is well worth the attention of the full court, quite apart from the issue of intercircuit conflict. The potential liabilities of the nation's schools, already financially hard-pressed, are staggering, since insults, teasing, petty persecutions, grabbing, poking, sexual experimentation, and other forms of what might actually or arguably constitute sexual harassment are an omnipresent feature of school life. Liability for failing to prevent or rectify sexual harassment of one student by another places a school on a razor's edge, since the remedial measures that it takes against the alleged harasser are as likely to expose the school to a suit by him as a failure to take those measures would be to expose the school to a suit by the victim of the alleged harassment.

I tentatively favor the adoption of a standard of liability that would give schools substantial protection against being sued for failing to guess right about the proper management of sexual and related nastiness among their charges. That is the standard of "deliberate indifference," and I shall explain it in a moment. The clearest alternative, the negligence standard, would not give the schools sufficient protection. The panel acknowledges this; none of its members endorses the negligence standard. Judge Cummings' opinion adopts a hybrid standard: the school must have actual knowledge of the harassment; but if it does, then it is liable (as I read the opinion) if it fails to respond with "prompt and appropriate action." This could mean, if it acts negligently. This would still not be the negligence standard, because that standard does not require knowledge of the risk; that is why I call Judge Cummings' standard a hybrid. Some language in his opinion, however, suggests a higher standard than simple negligence to govern the school's response to knowledge of a risk ("courts should not second-guess the professional judgments of school officials"), as does the language of Judge Evans' concurrence. Judge Coffey would limit liability to instances in which the school's misconduct can fairly be described as intentional, an approach very similar to deliberate indifference. It is unclear how much real "space" there is between the positions of Judges Cummings and Evans on the one hand and Judge Coffey on the other; it is not even clear that Judges Cummings and Evans see completely eye to eye; nor is what I have described as the hybrid standard sufficiently clear, precise, or familiar to provide sure guidance to school officials and their lawyers.

We need to consider the important issue of the proper standard as a court. The hybrid standard is a possibility but would have to be more clearly defined to be serviceable. Simple negligence is another possibility, gross negligence a third. The statute does not say. We must choose. My tentative preference is for the standard of deliberate indifference. Title IX in general and section 1681(a) in particular are not designed to create a comprehensive and stringent new regime for the regulation of sexual harassment in schools but to create sex equality in educational programs and facilities. The analogy to Title VII is deceptive, since Title VII regulates the behavior of adults in the workplace rather than the inevitably unruly behavior of adolescents. It may be excessive intrusion into the management of the schools for the courts to sanction them for failing to prevent the harassment of one student by another unless the school's failure can fairly be described as intentional.

Three types of intentional failure can be

distinguished. The first, which must be very rare, is where the school wants the harassment to occur. The second is where the school deliberately treats harassment differently depending on the sex, race, etc. of the pupils involved. There too, liability is clear. The third and most difficult case is where the school knows about the harassment, knows that it is serious or even dangerous, and could take effective measures at low cost to avert the danger, but decides--consciously, deliberately--to do nothing, although it does not base this decision on an invidious ground such as race or sex. The school doesn't mean any harm to the victim of the harassment, but knowing that the harassment is occurring, is serious, etc., it decides to do nothing. An example mentioned in Judge Coffey's opinion is where the school deliberately departs, without adequate excuse, from its established policy in dealing with such incidents.

This difficult third case is the domain of "deliberate indifference," which is the equivalent of criminal recklessness. E.g., Farmer v. Brennan, 511 U.S. 825 (1994); West v. Waymire, 114 F.3d 646, 651 (7th Cir. 1997). Neither gross negligence, nor recklessness in the tort sense, is enough to satisfy this standard. E.g., Billman v. Indiana Department of Corrections, 56 F.3d 785, 788 (7th Cir. 1995); Sellers v. Henman, 41 F.3d 1100 (7th Cir. 1994). The standard of deliberate indifference has been invoked in a number of other school cases. Kinman v. Omaha Public School District, 94 F.3d 463, 467 (8th Cir. 1996); Doe v. Claiborne County, 103 F.3d 495, 508 (6th Cir. 1996); Doe v. Taylor Independent School District, 15 F.3d 443, 454 (5th Cir. 1994). Two of these cases also impose a negligence standard for misconduct by the teacher; that is an issue currently before the Supreme Court.

Deliberate indifference by the school in a case of one student sexually harassing another would mean that the school (1) actually knew of (2) hostile or offensive conduct likely to interfere with the victim's education, and (3) deliberately did nothing, or took steps that it knew would be ineffectual, to protect the victim, (4) without excuse (for it might be difficult or even impossible to take effective measures). Elements (1) and (4) will both be more difficult for the plaintiff to satisfy when the harassment occurs off the school premises; and that is how it should be because it is much more difficult for the school to discover and remedy off-premises harassment.

Through careful examination of alternative standards of liability, we can find the standard that will best fit the purposes and circumstances of Title IX and that will be simple and workable. That is a challenge well worth the court's plenary

consideration.